ESTADO LIBRE ASOCIADO DE PUERTO RICO
TRIBUNAL DE PRIMERA INSTANCIA
CENTRO JUDICIAL DE PONCE
SALA SUPERIOR

**Salón 602**

| | |
|---|---|
| TROPICAL SOLAR FARM, LLC; TROPICAL SOLAR FARM HOLDING, LLC; JONAS SOLAR ENERGY, LLC; Y ROBERTO TORRES TORRES<br><br>Demandantes<br><br>v.<br><br>CIRO GROUP, CORP.; CIRO ENERGY, CORP.; CIRO ONE SALINAS, LLC; CIRO TWO POWER FACILITY, LLC; CIRO THREE POWER FACILITY, LLC; CIRO ENERGY PARTNERS, LLC; ROSENDIN ELECTRIC, INC.; ENOVATE ADVISORS, LLC.; RUBÉN PÉREZ RÍOS, FRANCES M. CINTRÓN CRUZ, y la sociedad legal de bienes gananciales compuesta por ambos; MARIO TOMASINI ACEVEDO; GUSTAVO CORUJO RAMSEY, SRA. CORUJO, y la sociedad legal de bienes gananciales compuesta por ambos; JUAN VALENTÍN RAMOS, SRA. VALENTÍN RAMOS, y la sociedad legal de bienes gananciales compuesta por ambos; JOEL A. VALENTÍN RÍOS, SRA. VALENTÍN RÍOS, y la sociedad legal de bienes gananciales; DUNCAN FREDERICK, SRA. FREDERICK, y la sociedad legal de bienes gananciales; FULANO DE TAL; SUTANO DE TAL, ASEGURADORA ABC; ASEGURADORA DEF; ASEGURADORA GHI; ASEGURADORA JKL; Y ASEGURADORA XYZ<br><br>Demandados | Civil Núm.: JAC2012-0094<br><br>Sobre:<br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br>Incumplimiento de Contrato; Daños y Perjuicios; Mala Fe Contractual; Interferencia Torticera con las obligaciones contractuales; RICO Act |

**EMPLAZAMIENTO**

ESTADOS UNIDOS DE AMERICA
EL PRESIDENTE DE LOS ESTADOS UNIDOS                    SS.
ESTADO LIBRE ASOCIADO DE PUERTO RICO

**A:**    CIRO ENERGY PARTNERS, LLC

POR LA PRESENTE, se le emplaza para que presente al tribunal su alegación responsiva a la demanda dentro de los treinta (30) días de haber sido diligenciado este emplazamiento, excluyéndose el día del diligenciamiento, notificando copia de la misma al abogado de la parte demandante o a ésta, de no tener representación legal.  Si usted deja de presentar su alegación responsiva dentro del referido término, el tribunal podrá dictar sentencia en rebeldía en su contra y conceder el remedio solicitado en la demanda o cualquier otro, si el tribunal, en el ejercicio de su sana discreción, lo entiende procedente.

**Muñoz Nazario Law Offices, PSC**
Lcda. Pilar Muñoz Nazario
P. O. Box 801480
Coto Laurel, PR  00780-1480
pilar@munoznazario.com
Tel: (787) 843-6060   Fax: (787) 843-6080

Expedido bajo mi firma y el Sello del Tribunal, hoy día _____ de __DEC 0 3 2012__ de 2012.

EVELYN CASASNOVAS MALDONADO
Secretaria Regional

_____       _____       DEC 0 3 2012
*Nombre Secretario(a)*              *Firma Secretario(a)*                *Fecha*

CAROLINE DE JESÚS GARCÍA
Secretaria Auxiliar del Tribunal

_____       _____       DEC 0 3 2012
*Nombre Sub-Secretario(a)*          *Firma Sub-Secretario(a)*            *Fecha*

Caso núm.

## DILIGENCIAMIENTO DEL EMPLAZAMIENTO

Yo, _Christian Rosado_ , declaro tener capacidad legal conforme la Regla 4.3 de Procedimiento Civil de Puerto Rico, y certifico que el diligenciamiento del emplazamiento y de la demanda del caso de referencia fue realizado por mí, el _5_ de _dic_ de 2012, de la siguiente forma:

☑ Mediante entrega personal a la parte demanda en la siguiente dirección física:

_en el Hote San Juan  al Sv. Maria Tomosini._

☐ Accesible en la inmediata presencia de la parte demandada en la siguiente dirección física:

☐ Dejando copia de los documentos a un(a) agente autorizado(a) por la parte demandada o designada por ley para recibir emplazamientos en la siguiente dirección física:

_____

☐ No se pudo diligenciar el emplazamiento, personalmente, debido a que:

_____
_____

### COSTOS DEL DILIGENCIAMIENTO
$_____

### DECLARACION DEL (DE LA) EMPLAZADOR(A)

Declaro bajo pena de perjurio, conforme a las leyes del Estado Libre Asociado de Puerto Rico, que la información provista en el diligenciamiento del emplazamiento es verdadera y correcta. Y para que así conste, suscribo la presente en _____, Puerto Rico, hoy día ___ de _____ de 2012.

_____
Firma del emplazador(a)

_____

_____
Dirección del (de la) emplazador(a)

AFFIDAVIT NUM.:

Jurado(a) y suscrito(a) ante mí, por )_____, de las circunstancias personales anteriormente mencionadas, a quien doy fe de conocer _____

(conocimiento personal o, en su defecto, la acreditación del medio supletorio provisto por la Ley Notarial)

En _____, Puerto Rico, a _____ de _____ de 2012.

NOTARIO PUBLICO

ESTADO LIBRE ASOCIADO DE PUERTO RICO
TRIBUNAL DE PRIMERA INSTANCIA
CENTRO JUDICIAL DE PONCE
SALA SUPERIOR

602

| | |
|---|---|
| TROPICAL SOLAR FARM, LLC; TROPICAL SOLAR FARM HOLDING, LLC; JONAS SOLAR ENERGY, LLC; Y ROBERTO TORRES TORRES <br><br> Demandantes <br><br> v. <br><br> CIRO GROUP, CORP.; CIRO ENERGY, CORP.; CIRO ONE SALINAS, LLC; CIRO TWO POWER FACILITY, LLC; CIRO THREE POWER FACILITY, LLC; CIRO ENERGY PARTNERS, LLC; ROSENDIN ELECTRIC, INC.; ENOVATE ADVISORS, LLC.; RUBÉN PÉREZ RÍOS, FRANCES M. CINTRÓN CRUZ, y la sociedad legal de bienes gananciales compuesta por ambos; MARIO TOMASINI ACEVEDO; GUSTAVO CORUJO RAMSEY, SRA. CORUJO, y la sociedad legal de bienes gananciales compuesta por ambos; JUAN VALENTÍN RAMOS, SRA. VALENTÍN RAMOS, y la sociedad legal de bienes gananciales compuesta por ambos; JOEL A. VALENTÍN RÍOS, SRA. VALENTÍN RÍOS, y la sociedad legal de bienes gananciales; DUNCAN FREDERICK, SRA. FREDERICK, y la sociedad legal de bienes gananciales; FULANO DE TAL; SUTANO DE TAL, ASEGURADORA ABC; ASEGURADORA DEF; ASEGURADORA GHI; ASEGURADORA JKL; Y ASEGURADORA XYZ <br><br> Demandados | Civil Núm.: JAC 2012-0694 <br><br><br> Sobre: <br><br><br><br> Incumplimiento de Contrato; Daños y Perjuicios; Mala Fe contractual; Interferencia Torticera con las obligaciones contractuales; RICO Act |

## DEMANDA

AL HONORABLE TRIBUNAL:

Comparece la parte demandante, Tropical Solar Farm, LLC; Tropical Solar Farm Holding, LLC; Jonas Solar Energy, LLC; y Roberto Torres Torres, por conducto de su representación legal que suscribe y muy respetuosamente alega, expone y solicita:

1. La parte co-demandante, Tropical Solar Farm, LLC (en adelante Tropical Solar), es una compañía de responsabilidad limitada debidamente constituida y autorizada a hacer negocios en Puerto Rico, con número corporativo 300924. La dirección física de su oficina designada en Puerto Rico, según el Registro del Departamento de Estado, es: Carr. 368, Km. 12.5, Yauco, Puerto Rico, 00698; y la postal: PO Box 1096, Guánica, Puerto Rico, 00653. Su Presidente y Agente Residente es el Sr. Roberto Torres.

2. La parte co-demandante, Tropical Solar Farm Holding, LLC (en adelante Tropical Holding), es una compañía de responsabilidad limitada debidamente constituida en el estado de

Tropical Solar Farm 116, et als. v. CIRO Group, Corp., et als.
Demanda
~ 2 ~

Case 3:12-cv-02016-GAG   Document 1-3   Filed 12/12/12   Page 4 of 33

Delaware, con número corporativo (en DE) 5058955. La dirección de su oficina principal es: Harvard Business Services, Inc. 16192 Coastal Hwy, Lewes, Sussex, DE, 19958. Su Presidente es el Sr. Roberto Torres.

3. Tropical Holding es la dueña de la totalidad de las acciones de Tropical Solar.

4. La parte co-demandante, Jonas Solar Energy, LLC (en adelante Jonas), es una compañía de responsabilidad limitada debidamente constituida y autorizada a hacer negocios en Puerto Rico, con número corporativo 309616. La dirección física de su oficina designada en Puerto Rico, según el Registro del Departamento de Estado, es: Carr. 368, Km. 12.5, Yauco, Puerto Rico, 00698; y la postal: PO Box 1096, Guánica, Puerto Rico, 00653. Su Presidente y Agente Residente es el Sr. Roberto Torres.

5. El Sr. Roberto Torres es dueño de la totalidad de las acciones de Tropical Holding y de Jonas.

6. La parte co-demandante, CPA Roberto Torres Torres (en adelante Sr. Roberto Torres), mayor de edad, contador público autorizado, casado con Wanda Quiñones Nieves, y vecino de Yauco. Su dirección postal es: PO Box 1086, Guánica, Puerto Rico, 00653-1096.

7. La parte co-demandada, CIRO Group, Corp. (en adelante CIRO Group) es una corporación con fines de lucro debidamente constituida y autorizada a hacer negocios en Puerto Rico, con número corporativo 180662. Su dirección física y postal, según el Registro del Departamento de Estado, es: Urbanización Park Gardens, B-6 Rocky Mountain, San Juan, Puerto Rico, 00926-2105. Su agente residente y presidente es el Sr. Rubén Pérez Ríos.

8. La parte co-demandada, CIRO Energy, Corp. (en adelante CIRO Energy) es una corporación con fines de lucro debidamente constituida y autorizada a hacer negocios en Puerto Rico, con número corporativo 203915. Su dirección postal, según el Registro del Departamento de Estado, es: PO Box 908, San Just, Puerto Rico, 00978, y su dirección física es: Urbanización Park Gardens, B-6 Rocky Mountain, San Juan, Puerto Rico, 00926-2105.

9. CIRO Energy no ha radicado el Informe Anual correspondiente al año 2011, por ende, no se indica quién es su presidente ni agente residente. Lo único que surge del Departamento de Estado es que sus directores serán: Sr. Juan Valentín Ramos, Sr. Rubén Pérez Pérez, y Sr. Mario Tomasini Acevedo.

10. Acorde a los documentos suscritos entre las partes, el Sr. Mario Tomasini es el Presidente y Tesorero de CIRO Energy. De la misma forma, el Sr. Rubén Pérez es el Vice-

Case 3:12-cv-02010-GAG   Document 1-3   Filed 12/12/12   Page 5 of 33
Tropical Solar Farm, LLC, et als. v. CIRO Group, Corp., et als.
Demanda
~ 3 ~

Presidente y Secretario de CIRO Energy.

11. La parte co-demandada, CIRO One Salinas, LLC (en adelante CIRO One) es una compañía de responsabilidad limitada debidamente constituida en el estado de Delaware, con número corporativo (en DE) 4946899 y autorizada a hacer negocios en Puerto Rico, con número corporativo (en PR) 1080. La dirección de su oficina principal es: National Corporate Research, Ltd., 615 Sout Dupont Highway, Dover, Delaware, 19901. La dirección física de su oficina designada en Puerto Rico, según el Registro del Departamento de Estado, es: Calle Rocky Mountain B-6, Park Gardens, San Juan, Puerto Rico, 00926-2105; y la postal: PO Box 908, Saint Just, Puerto Rico, 00978. Su agente residente es el Sr. Rubén Pérez Ríos.

12. La parte co-demandada, CIRO Two Power Facility, LLC (en adelante CIRO One) es una compañía de responsabilidad limitada debidamente constituida en el estado de Delaware, con número corporativo (en DE) 5101433 y autorizada a hacer negocios en Puerto Rico, con número corporativo (en PR) 1315. La dirección de su oficina principal y de su oficina designada, según el Registro del Departamento de Estado, es: 2711 Centerville Rd., Suite 400, Willmington, Delaware, 19808. Sus incorporadores son el Sr. Rubén Pérez, Mario Tomasini y Juan Valentín. No se indica nombre ni información sobre su agente residente.

13. La parte co-demandada, CIRO Three Power Facility, LLC (en adelante CIRO One) es una compañía de responsabilidad limitada debidamente constituida en el estado de Delaware, con número corporativo (en DE) 5101445 y autorizada a hacer negocios en Puerto Rico, con número corporativo (en PR) 1316. La dirección de su oficina principal y de su oficina designada, según el Registro del Departamento de Estado, es: 2711 Centerville Rd., Suite 400, Willmington, Delaware, 19808. Su incorporador es el Sr. Rubén Pérez. No se indica nombre ni información sobre su agente residente.

14. La parte co-demandada, CIRO Energy Partners, LLC (en adelante CIRO One) es una compañía de responsabilidad limitada debidamente constituida y autorizada a hacer negocios en Puerto Rico, con número corporativo 3739. La dirección física de su oficina designada en Puerto Rico, según el Registro del Departamento de Estado, es: Calle Rocky Mountain B-6, Park Gardens, San Juan, Puerto Rico, 00926-2105; y la postal: PO Box 908, Saint Just, Puerto Rico, 00978. No se indica nombre ni información sobre su agente residente.

15. CIRO Group, CIRO Energy, CIRO One, CIRO Two, CIRO Three, CIRO Energy Partners, constituyen un grupo controlado de corporaciones propiedad de las mismas personas.

*Tropical Solar Farm, LLC, et als. v. CIRO Group, Corp., et als.*
Demanda
~ 4 ~

16. La parte co-demandada, Rosendin Electric, Inc. (en adelante Rosendin) es una corporación con fines de lucro debidamente constituida en el estado de California, con número corporativo (en CA) C0274896, y autorizada a hacer negocios en Puerto Rico, con número corporativo (en PR) 15563. La dirección de su oficina principal es: 880 Mabury Road, San Jose, California, 95133. La dirección física y postal de su oficina designada en Puerto Rico, según el Registro del Departamento de Estado, es: CT Corporation 361, San Francisco St., San Juan, Puerto Rico, 00901. No se indica nombre ni información sobre su agente residente.

17. La parte co-demandada, Enovate Advisors, LLC,[1] (en adelante Enovate) es una compañía de responsabilidad limitada debidamente constituida y autorizada a hacer negocios en California, con número corporativo (en CA) 201127610323. La dirección de su oficina principal es: 880 Mabury Road, San Jose, California, 95133. Dicha entidad no está registrada en el Departamento de Estado de Puerto Rico. El Sr. Duncan Frederick es oficial de esta entidad.

18. La parte co-demandada, Sr. Rubén Pérez Ríos (en adelante Sr. Rubén Pérez), mayor de edad, casado con la Sra. Frances M. Cintrón Cruz, ejecutivo y vecino de San Juan, Puerto Rico, es el Presidente de CIRO Group, Corp. La dirección postal que aparece en el Informe Anual de CIRO Group es: número 7 Avenida Simón Madera, Río Piedras, Puerto Rico, 00924.

19. El Sr. Rubén Pérez es accionista y oficial de todas las corporaciones y entidades demandadas. Él, tanto en su carácter representativo como en su carácter personal, fue parte de las actuaciones que le han causado daños a la parte demandante y del patrón de extorsión aquí reclamado.

20. La parte co-demandada, Sra. Frances M. Cintrón Cruz, mayor de edad, casada y vecina de San Juan, Puerto Rico, es la esposa del Sr. Rubén Pérez. Se incluye a la Sociedad de Bienes Gananciales compuesta por el Sr. Rubén Pérez y la Sra. Cintrón porque las actuaciones aquí mencionadas podrían ser, en parte o en su totalidad, responsabilidad de dicha Sociedad, de existir la misma.

21. La parte co-demandada, Sr. Mario Tomasini Acevedo (en adelante Sr. Mario Tomasini), mayor de edad, soltero, ejecutivo y vecino de San Juan, Puerto Rico, es el Vice-Presidente de CIRO Group, Corp. La dirección postal que aparece en el Informe Anual de CIRO Group es: número 7 Avenida Simón Madera, Río Piedras, Puerto Rico, 00924.

22. El Sr. Mario Tomasini es accionista y oficial de todas las corporaciones y entidades

---

[1] Acorde a una información provista por el Sr. Duncan Frederick, Enovate es subsidiaria de Rosendin.

demandadas. Él, tanto en su carácter representativo como en su carácter personal, fue parte de las actuaciones que le han causado daños a la parte demandante y del patrón de extorsión aquí reclamado.

23. La parte co-demandada, Sr. Gustavo Corujo Ramsey (en adelante Sr. Gustavo Corujo), mayor de edad, casado, ejecutivo y vecino de San Juan, Puerto Rico, es el Tesorero de CIRO Group, Corp. La dirección postal que aparece en el Informe Anual de CIRO Group es: número 7 Avenida Simón Madera, Rio Piedras, Puerto Rico, 00924.

24. El Sr. Gustavo Corujo es accionista y oficial de todas las corporaciones y entidades demandadas. Él, tanto en su carácter representativo como en su carácter personal, fue parte de las actuaciones que le han causado daños a la parte demandante y del patrón de extorsión aquí reclamado.

25. La parte co-demandada, Sra. Corujo es un nombre ficticio utilizado para identificar a la esposa del Sr. Gustavo Corujo. Tan pronto se conozca su nombre y circunstancias se enmendará la presente.

26. Se incluye a la Sociedad de Bienes Gananciales compuesta por el Sr. Gustavo Corujo y la Sra. Corujo porque las actuaciones aquí mencionadas podrían ser, en parte o en su totalidad, responsabilidad de dicha Sociedad, de existir la misma.

27. La parte co-demandada, Sr. Juan Valentín Ramos (en adelante Sr. Juan Valentín), mayor de edad, casado, ejecutivo y vecino de San Juan, Puerto Rico, es accionista y oficial de las entidades demandadas. Su dirección es: Calle Villa Mayorca B-12, Antigua Encantada, Trujillo Alto, Puerto Rico, 00976.

28. El Sr. Juan Valentín es accionista y oficial de todas las corporaciones y entidades demandadas. Él, tanto en su carácter representativo como en su carácter personal, fue parte de las actuaciones que le han causado daños a la parte demandante y del patrón de extorsión aquí reclamado.

29. La parte co-demandada, Sra. Valentín Ramos es un nombre ficticio utilizado para identificar a la esposa del Sr. Juan Valentín. Tan pronto se conozca su nombre y circunstancias se enmendará la presente.

30. Se incluye a la Sociedad de Bienes Gananciales compuesta por el Sr. Juan Valentín y la Sra. Valentín Ramos porque las actuaciones aquí mencionadas podrían ser, en parte o en su totalidad, responsabilidad de dicha Sociedad, de existir la misma.

31. La parte co-demandada, Sr. Joel A. Valentín Ríos (en adelante Sr. Joel Valentín), mayor de edad, casado, ejecutivo y vecino de San Juan, Puerto Rico, es accionista y oficial de las entidades demandadas. La dirección postal (de negocios) que aparece en el Certificado de Autorización para hacer negocios de una compañía de responsabilidad limitada de CIRO One es: PO Box 908, Saint Just, Puerto Rico, 00978.

32. El Sr. Joel Valentín es accionista y oficial de todas las corporaciones y entidades demandadas. Él, tanto en su carácter representativo como en su carácter personal, fue parte de las actuaciones que le han causado daños a la parte demandante y del patrón de extorsión aquí reclamado.

33. La parte co-demandada, Sra. Valentín Ríos es un nombre ficticio utilizado para identificar a la esposa del Sr. Joel Valentín. Tan pronto se conozca su nombre y circunstancias se enmendará la presente.

34. Se incluye a la Sociedad de Bienes Gananciales compuesta por el Sr. Joel Valentín y la Sra. Valentín Ríos porque las actuaciones aquí mencionadas podrían ser, en parte o en su totalidad, responsabilidad de dicha Sociedad, de existir la misma.

35. La parte co-demandada, Sr. Duncan Frederick (en adelante Sr. Duncan Frederick), mayor de edad, casado, ejecutivo y vecino de San Juan, Puerto Rico, es accionista y oficial de las entidades demandadas.

36. El Sr. Duncan Frederick es accionista y oficial de todas las corporaciones y entidades demandadas. Él, tanto en su carácter representativo como en su carácter personal, fue parte de las actuaciones que le han causado daños a la parte demandante y del patrón de extorsión aquí reclamado.

37. La parte co-demandada, Sra. Frederick es un nombre ficticio utilizado para identificar a la esposa del Sr. Duncan Frederick. Tan pronto se conozca su nombre y circunstancias se enmendará la presente.

38. Se incluye a la Sociedad de Bienes Gananciales compuesta por el Sr. Duncan Frederick y la Sra. Frederick porque las actuaciones aquí mencionadas podrían ser, en parte o en su totalidad, responsabilidad de dicha Sociedad, de existir la misma.

39. Fulano de Tal y Sutano de Tal son personas, naturales o jurídicas, que pueden serle responsable, en todo o en parte, a la parte demandante, por lo aquí reclamado

40. Aseguradora ABC, Aseguradora DEF, Aseguradora GHI, Aseguradora JKL y

Case 3:12-cv-02010-GAG   Document 1-3   Filed 12/12/12   Page 9 of 33
*Tropical Solar Farm, LLC, et als. v. CIRO Group, Corp., et als.*
Demanda
~ 7 ~

Aseguradora XYZ son entidades que pueden haber expedido un seguro, el cual cubre, en todo o en parte, la reclamación de autos.

41. La presente reclamación se presenta ante el Tribunal de Primera Instancia, Sala de Ponce, toda vez que las partes, en el "Asset Purchase Agreement" se sometieron a la jurisdicción y competencia de este Foro.

42. Después de algunas negociaciones, el 14 de octubre del 2011, CIRO Group y Tropical suscribieron una "Letter of Understanding" (Carta de entendimiento) (en adelante LOU), para comprar un proyecto de energía renovable de 40MW a ubicarse en Guayanilla, Puerto Rico, que, en ese momento, estaba negociando Tropical Solar con la Autoridad de Energía Eléctrica ("Puerto Rico Electrical Power Autorithy") (en adelante PREPA).

43. Es menester mencionar que, a ese momento, Tropical Solar no tenía un contrato con PREPA suscrito para dicho proyecto de energía renovable. En ese momento, Tropical Solar estaba negociando el referido contrato.

44. Como CIRO conocía de las negociaciones entre Tropical Solar y PREPA y mostrando su interés en adquirir el mismo, si se concretizaban dichas negociaciones, suscribió la LOU.

45. CIRO Group, demostrando su interés en adquirir dicho contrato - si se formalizaba - suscribió dicha LOU.

46. El 1 de noviembre del 2011 Tropical Solar otorgó un Power Purchase and Operating Agreement (en adelante PPOA de Guayanilla) con PREPA, para desarrollar un proyecto de energía solar de 40MW en Guayanilla, Puerto Rico.

47. El 2 de noviembre del 2011 CIRO Group y Tropical Solar suscribieron un documento intitulado con relación al PPOA de Guyanilla que acababa de obtener Tropical Solar y a un préstamo que CIRO Group le haría a Tropical Solar de doscientos mil dólares ($200,000.00) para que Tropical Solar los depositará en PREPA.

48. Es menester mencionar que, en este documento las partes se sometieron a la jurisdicción del Tribunal Federal para el Distrito de Puerto Rico y a los Tribunales del Estado Libre Asociado de Puerto Rico.[2] De la misma forma, las partes renunciaron, en caso de poder solicitarlo, a solicitar juicio por jurado.

49. CIRO Group incumplió con el párrafo séptimo de este documento, pues en la Demanda que acaba de radicar en el Tribunal Federal solicitó juicio por jurado.

---

[2] Esto fue posteriormente modificado y se sometieron a la jurisdicción del Tribunal de Primera Instancia, Sala de Ponce.

50. Tropical Solar, acorde al artículo 22 del PPOA de Guayanilla[3] asignó este contrato a Tropical Holding.

51. El 10 de noviembre del 2011 CIRO Energy[4] y el Sr. Roberto Torres, suscribieron una carta de entendimiento (en adelante LOU de 10 de noviembre) para la compra de las acciones de Tropical Holding, por la cantidad diez millones de dólares ($10,000,000.00) pagaderos de acuerdo al "Escrow Agreement".

52. Como parte de las negociaciones se escogió a UBS Trust Company of Puerto Rico (en adelante UBS) como mediador y fiduciario de las prestaciones y contraprestaciones de este contrato. De la misma forma, las partes acordaron las penalidades que el "Escrow Agent" aplicaría en caso de incumplimiento de las partes.

53. El LOU del 10 de noviembre del 2011 establecía las penalidades aplicables ante el incumplimiento de las partes.

54. El 11 de noviembre del 2011, CIRO Energy, el Sr. Roberto Torres y UBS suscribieron un "Escrow Agreement". En ese mismo acto, se creo una cuenta escrow que estaría bajo el control absoluto de UBS, el "Escrow Agent".

55. El "Escrow Agreement" establecía las obligaciones, de conformidad al LOU del 10 de noviembre, de las partes. De la misma forma, establecía las instrucciones al "Escrow Agent" en caso de incumplimiento de las obligaciones contractuales.

    a. Obligaciones del Sr. Roberto Torres:

        i. Entregar todas las acciones (originales) de Tropical Holding y el original del PPOA de Guayanilla de Tropical Holding con PREPA, al "Escrow Agent".

        ii. El Sr. Roberto Torres cumplió con estas obligaciones contractuales.

    b. Obligaciones de CIRO Energy, Corp.:

        i. Pagar de acuerdo a la estructura de pago.

    c. La estructura de pago era la siguiente[5]:

        i. El 14 de noviembre del 2011 - CIRO Energy tenía que depositar en el "escrow account" la suma de un millón de dólares ($1,000,000.00).

        ii. El 30 de noviembre del 2011 - CIRO Energy tenía que depositar en el

---

[3] El artículo 22 del PPOA de Guayanilla le permitía a Tropical Solar asignar el contrato a Tropical Holding sin la autorización de PREPA.
[4] En este momento, CIRO Group, y sus oficiales aquí demandados, determinaron hacer negocios con otra entidad.
[5] La misma también está incluida en la LOU del 10 de noviembre del 2011.

Case 3:12-cv-02010-GAG   Document 1-3   Filed 12/12/12   Page 11 of 33
*Tropical Solar Farm, LLC, et als. v. CIRO Group, Corp., et als.*
Demanda
~ 9 ~

"escrow account" la suma de cuatro millón de dólares ($4,000,000.00).

    iii.  El 16 de enero del 2012 - CIRO Energy tenía que depositar en el "escrow account" la suma de cinco millones de dólares ($5,000,000.00).

  d.  Instrucciones al "escrow agent" por incumplimiento[6]:

    i.  De CIRO Energy no cumplir con el segundo pago (el del 30 de noviembre del 2011), el "escrow agent" debería desembolsarle, de ser solicitado por el Sr. Roberto Torres, la suma de medio millón de dólares ($500,000.00) y devolverle las acciones y contrato original del PPOA de Guayanilla al Sr. Roberto Torres. El balance restante le sería devuelto a CIRO Energy ($500,000.00).

    ii.  De CIRO Energy no cumplir con el tercer pago (16 de enero del 2012) el contrato quedaría cancelado. Sin embargo, como cláusula penal, el Sr. Roberto Torres retendría la suma de tres millones de dólares ($3,000,000.00). De la misma forma, el "Escrow Agent" le entregaría las acciones y el original del PPOA de Guayanilla. El dinero restante le sería devuelto a CIRO Energy ($2,000,000.00).

56. El 11 de noviembre del 2011 CIRO Energy y el Sr. Roberto Torres suscribieron un documento titulado "Transaction Agreement Contract" (en adelante TAC del 11 de noviembre), el cual **reemplazó** el LOU del 10 de noviembre del 2011 convirtiéndose en el contrato final y vinculante entre las partes. De la misma forma, se suscribió un "Escrow Agrement" enmendado.

57. El TAC del 11 de noviembre del 2011 era para la compra de las acciones de Tropical Holding y para un Master Agreement que en ese momento estaba negociando Tropical Solar con PREPA. De conformidad al TAC del 11 de noviembre del 2011 el precio del PPOA de Guayanilla aumentaría a diez millones y medio de dólares ($10,5000,000.00) y de Tropical Solar obtener el Master Agreement con PREPA, en o antes del 31 de diciembre del 2011, CIRO Energy pagaría, por dicho contrato, la suma adicional de ocho millones de dólares ($8,000,000.00).

58. Como parte de las negociaciones se mantuvo a UBS como mediador y fiduciario de las prestaciones y contraprestaciones de este contrato, y las penalidades que el "Escrow Agent" aplicaría.

---

[6] Estas penalidades por incumplimiento surgen de la LOU del 10 de noviembre del 2011.

59. De la misma forma, en el TAC del 11 de noviembre del 2011, CIRO y sus accionistas (los aquí demandados) garantizaron, tanto en su carácter corporativo como personal, que obtendrían el "Safe Harbor of the Federal Grant" que vencía el 31 de diciembre del 2011, a su único costo. Esta garantía, tanto de CIRO como de sus accionistas, subsistiría aún en el evento de que CIRO no cumpliera con este contrato. En ese caso, CIRO vendría comprar el PPOA de Guayanilla en el precio pactado de diez y medio millones de dólares ($10,500,000.00) y el Master de Tropical por ocho millones de dólares ($8,000,000.00)

60. Ese mismo día, 11 de noviembre del 2011, se firmó un "Escrow Agreement" entre CIRO Energy, Sr. Roberto Torres y UBS, el cual **sustituyó** el "escrow agreement" anterior. La cuenta escrow fue enmendada mediante este contrato, pero no se abrió una nueva. La cuenta escrow se mantuvo bajo el control de UBS ("escrow agent").

61. El "Escrow Agreement" establecía las obligaciones, de conformidad al TAC del 11 de noviembre, de las partes. De la misma forma, establecía las instrucciones al "Escrow Agent" en caso de incumplimiento de las obligaciones contractuales.

    a. Obligaciones del Sr. Roberto Torres:

        i. Entregar todas las acciones (originales) de Tropical Holding y el original del PPOA de Tropical Holding con PREPA al "Escrow Agent".

        ii. El Sr. Roberto Torres cumplió con estas obligaciones contractuales.

    b. Obligaciones de CIRO Energy, Corp.:

        i. Pagar de acuerdo a la estructura de pago.

    c. La estructura de pago era la siguiente[7]:

        i. El 14 de noviembre del 2011 - CIRO Energy tenía que depositar en el "escrow account" la suma de un millón de dólares ($1,000,000.00). CIRO Energy cumplió con este pago.

        ii. El 29 de diciembre del 2011[8] - CIRO Energy tenía que depositar en el "escrow account" la suma de dos millón de dólares ($2,000,000.00).[9]

        iii. El 16 de enero del 2012 - CIRO Energy tenía que depositar en el "escrow account" la suma de siete millones y medio de dólares ($7,500,000.00).

---

[7] La misma también está incluida en la TAC del 11 de noviembre del 2011.
[8] Nótese que se cambió la fecha del segundo pago (del 30 de noviembre al 29 de diciembre) y se redujo la cantidad que tenía que depositar CIRO (de cuatro millones a dos millones de dólares).
[9] CIRO Energy cumplió con este pago, pero no fue realizado por ellos sino por Rosendin, una entidad hasta ese momento desconocida. Más adelante, se mencionan detalles de este suceso.

*Tropical Solar Farm, LLC, et als. v. CIRO Group, Corp., et als.*
Demanda
~ 11 ~

CIRO Energy no cumplió con este pago.

d.  Instrucciones al "Escrow Agent" en torno a los desembolsos del dinero a favor del Sr. Roberto Torres:

   i.  Al CIRO Energy depositar el primer pago (el 14 de noviembre del 2011), el millón de dólares ($1,000,000.00) se mantendría en la cuenta escrow bajo el control del "Escrow Agent".

   ii.  Al CIRO Energy depositar el segundo pago (el 29 de diciembre del 2011), el "Escrow Agent" debería desembolsarle al Sr. Roberto Torres la suma de tres millones de dólares ($3,000,000.00).

   iii.  Al CIRO Energy depositar el tercer pago (el 16 de enero del 2012), el "Escrow Agent" debería desembolsarle al Sr. Roberto Torres la suma de siete y medio millones de dólares ($7,500,000.00). De la misma forma, debería entregarle a CIRO Energy las acciones de Tropical Holding y el contrato original del PPOA de Guayanilla.

e.  Instrucciones al "escrow agent" por incumplimiento (cláusula penal de conformidad al TAC del 11 de noviembre del 2011)[10]:

   i.  De CIRO Energy no cumplir con el segundo pago (el del 29 de diciembre del 2011), el "escrow agent" debería desembolsarle, de ser solicitado por el Sr. Roberto Torres, la suma de un millón de dólares ($1,000,000.00) y devolverle las acciones y contrato original del PPOA de Guayanilla al Sr. Roberto Torres. El balance restante le sería devuelto a CIRO Energy.

   ii.  De CIRO Energy no cumplir con el tercer pago (16 de enero del 2012) el contrato quedaría cancelado. Sin embargo, como cláusula penal, el Sr. Roberto Torres retendría la suma de siete y medio millones de dólares ($7,500,000.00). De la misma forma, el "Escrow Agent" le entregaría las acciones y el original del PPOA de Guayanilla.

62. El 14 de noviembre del 2011, de conformidad al TAC del 11 de noviembre, CIRO Group[11] depositó la suma de un millón de dólares ($1,000,000.00) en la cuenta escrow bajo el control de UBS, mediante el cheque número 1222. Es decir, CIRO cumplió con el primer pago.

---

[10] Estas penalidades por incumplimiento surgen de la TAC del 11 de noviembre del 2011.
[11] Nótese que en ese momento la contratación era con CIRO Energy, pero el depósito fue realizado por CIRO Group.

*Tropical Solar Farm LLC et als. v. CIRO Group Corp. et als.*
Demanda
~ 12 ~
Case 3:12-cv-02010-GAG   Document 1-3   Filed 12/12/12   Page 14 of 33

63. El 25 de noviembre del 2012 CIRO Energy y el Sr. Roberto Torres suscribieron un documento titulado "Transaction Agreement Contract" (en adelante TAC del 25 de noviembre), el cual **constituyó un addendum** al LOU del 11 de noviembre del 2011.

64. El TAC del 25 de noviembre fue realizado a los únicos efectos de delimitar los términos de pago del Master Agreement, si Tropical obtenía el mismo en o antes del 31 de diciembre del 2011, toda vez que en el TAC del 11 de noviembre del 2011 se indicó que se compraría, de ser obtenido en o antes del 31 de diciembre del 2011, por la cantidad de ocho millones de dólares ($8,000,000.00), pero no se indicó cómo se pagaría dicha suma de dinero.

65. El resto del TAC del 11 de noviembre del 2011 permaneció inalterado, incluyendo, pero sin limitarse, a las garantías personales.

66. Ese mismo día, 25 de noviembre del 2011, se firmó un "Escrow Agreement" entre CIRO Energy, Sr. Roberto Torres y UBS, el cual **complementó** el "escrow agreement" anterior (el del 11 de noviembre del 2011). La cuenta escrow fue enmendada mediante este contrato, pero no se abrió una nueva. La cuenta escrow se mantuvo bajo el control de UBS ("escrow agent").

67. El "Escrow Agreement", firmado el 25 de noviembre del 2011, mantenía inalterada las obligaciones y la estructura de pago relacionada al PPOA de Guayanilla. Únicamente se incluyó la estructura de pago de los ocho millones de dólares ($8,000,000.00) del Master de Tropical.

    a. La estructura de pago de los ocho millones de dólares ($8,000,000.00) era la siguiente:

        i. El 30 de noviembre del 2011 - CIRO Energy tenía que depositar en el "escrow account" la suma de un medio millón de dólares ($500,000.00). CIRO Energy no cumplió con este pago de la forma establecida, según se explicará más adelante.

        ii. El 29 de diciembre del 2011 - CIRO Energy tenía que depositar en el "escrow account" la suma de un millón de dólares ($1,000,000.00).[12]

        iii. El 16 de enero del 2012 - CIRO Energy tenía que depositar en el "escrow account" la suma de seis y medio millones de dólares ($6,500,000.00).

    b. Instrucciones al "Escrow Agent" en torno a los desembolsos del dinero a favor del Sr. Roberto Torres:

---

[12] CIRO Energy cumplió con este pago, pero no fue realizado por ellos sino por Rosendin, una entidad hasta ese momento desconocida. Más adelante, se mencionan detalles de este suceso.

*Tropical Solar Farm, LLC, et als. v. CIRO Group, Corp., et als.*
Demanda
~ 13 ~

i.  Al CIRO Energy depositar el primer pago (el 30 de noviembre del 2011), el medio millón de dólares ($500,000.00) se mantendría en la cuenta escrow bajo el control del "Escrow Agent".

ii.  Al CIRO Energy depositar el segundo pago (el 29 de diciembre del 2011), el "Escrow Agent" debería desembolsarle al Sr. Roberto Torres la suma de un millón y medio de dólares ($1,500,000.00).

iii.  Al CIRO Energy depositar el tercer pago (el 16 de enero del 2012), el "Escrow Agent" debería desembolsarle al Sr. Roberto Torres la suma de seis y medio millones de dólares ($6,500,000.00). De la misma forma, debería entregarle a CIRO Energy el contrato original del Master Agreement de Tropical.

c.  Instrucciones al "escrow agent" por incumplimiento (cláusula penal)[13]:

i.  De CIRO Energy no cumplir con el segundo pago (el del 29 de diciembre del 2011), el "escrow agent" debería desembolsarle, de ser solicitado por el Sr. Roberto Torres, la suma de un medio millón de dólares ($500,000.00) y devolverle las acciones y contrato original del Master de Tropical al Sr. Roberto Torres.

ii.  De CIRO Energy no cumplir con el tercer pago (16 de enero del 2012) el contrato quedaría cancelado. Sin embargo, como cláusula penal, el Sr. Roberto Torres retendría la suma de un millón y medio de dólares ($1,500,000.00). De la misma forma, el "Escrow Agent" le entregaría las acciones y el original del Master de Tropical.

68. Como parte del TAC del 25 de noviembre del 2011, el 30 de noviembre del 2011, CIRO Energy tenía que depositar, en la cuenta escrow, la suma de medio millón de dólares ($500,000.00). CIRO Energy no cumplió con esta obligación contractual y, en la alternativa, el Sr. Mario Tomasini y el Sr. Rubén Pérez, accionistas y oficiales de CIRO, depositaron, en la cuenta escrow, unos bonos de inversión del Gobierno de Puerto Rico, que le pertenecían a ellos en su carácter personal, equivalentes a la suma de medio millón de dólares ($500,000.00).

69. Esta acción, por parte de los demandados, le causó gran malestar al Sr. Roberto Torres por la fluctuación constante, en valor en el mercado, de estos bonos, ya que esto podría

---

[13] Estas penalidades por incumplimiento surgen del TAC del 25 de noviembre del 2011.

resultar en una pérdida económica para el Sr. Roberto Torres. Esta actuación, por parte de los demandados, claramente constituye una violación al contrato otorgado entre las partes.

70. Cuando el Sr. Roberto Torres se enteró, por comunicación del "Escrow Agent", no de los accionistas de CIRO Energy, les reclamó a los señores Pérez y Tomasini, pues ello constituía una violación al contrato.

71. En ese momento, el Sr. Rubén Pérez y el Sr. Mario Tomasini le indicaron, al Sr. Robeto Torres, que CIRO Energy no tenía el dinero, en ese momento, para cumplir con los contratos firmados y, por ende, ellos decidieron depositar esas inversiones personales en sustitución de lo pactado.

72. El 13 de diciembre del 2011 Tropical Solar obtuvo el "Master Renewable Power Purchase and Operating Agreement" (en adelante Master de Tropical) de 40MW con la PREPA. Es decir, Tropical Solar cumplió con obtener el Master con PREPA en o antes del 31 de diciembre del 2011, por lo mismo, CIRO Energy venía obligado a comprar este contrato por la suma pactada, en el TAC del 11 de noviembre del 2011 (con los términos de pago establecidos en el TAC del 25 de noviembre del 2011), de ocho millones de dólares ($8,000,000.00), y de obtener el "federal grant" para este Master Agreement de Tropical.

73. Aproximadamente el 24 de diciembre del 2011 el Sr. Rubén Pérez y el Sr. Mario Tomasini se comunicaron con el Sr. Roberto Torres para indicarle que no tenían intenciones de cumplir con el segundo pago del 29 de diciembre del 2011 (tres millones)[14] debido a que no iban a poder realizar el tercer pago (de catorce millones de dólares) el 16 de enero del 2012, ya que no habían podido conseguir financiamiento y/o inversionistas de acuerdo a sus expectativas.

74. En ese momento, CIRO y sus accionistas, le solicitaron al Sr. Roberto Torres suscribir una enmienda al TAC del 14 de noviembre (con su addendum del TAC del 25 de noviembre) suscrito entre las partes, para posponer el pago del 16 de enero del 2012 para el 15 de marzo del 2012. El segundo pago, el del 29 de diciembre del 2011, por tres millones de dólares ($3,000,000.00) se quedaría igual.

75. En ese momento comenzó el patrón de extorsión de los demandados para con los demandantes, pues le indicaron que de no acceder a esta modificación iban a retirar los fondos y la solicitud para obtener el equipo necesario para cualificar para el treinta porciento (30%) del "federal grant", según se establece en sus obligaciones en el TAC del 14 de noviembre (sección

---

[14] Aquí están incluidos ambos contratos, a saber: el PPOA de Guayanilla y el Master de Tropical.

Tropical Solar Farm, LLC, et als. v. CIRO Group, Corp., et als.
Demanda
~ 15 ~

de garantías del Exhibit A), lo cual afectaría grandemente la viabilidad económica del proyecto de energía renovable.

76. Es menester explicar que, para poder obtener estos fondos, CIRO Energy tenía que comprar el cinco porciento (5%) del costo de construcción del proyecto en equipo antes del 31 de diciembre del 2011 y someter la solicitud ante el Departamento de Energía Federal. Esto significaba una inversión de aproximadamente diez millones de dólares ($10,000,000.00). Si CIRO y sus accionistas cumplían con los requisitos para que le concedieran el "federal grant", Tropical Solar recibiría el treinta porciento (30%) de su inversión en el proyecto de energía renovable, como un reembolso por parte del Gobierno de los Estados Unidos. De Tropical Solar no recibir este reembolso se afectaría sustancialmente la viabilidad del proyecto en términos de financiamiento, pues ello representaba aproximadamente una suma de cuarenta millones de dólares ($40,000,000.00).

77. Es menester mencionar que, en este momento, ya CIRO Energy estaba en "default" (incumplimiento) de sus obligaciones contractuales, por lo que, de conformidad al contrato, el Sr. Roberto Torres podía quedarse con el millón y medio de dólares ($1,500,000.00) depositados en la cuenta escrow, ello de conformidad a la cláusula penal que incluía el contrato.

78. No obstante ello, y ante este patrón de extorsión por parte de los demandados, el Sr. Roberto Torres accedió, de buena fe, a la enmienda solicitada.

79. A tenor con ello, el 27 de diciembre del 2011 se firmó, entre CIRO Energy y el Sr. Roberto Torres, un documento titulado "Revised Transaction Agreement Contract" a los únicos efectos de modificar la fecha del último pago y aumentar la cuantía del mismo por la tardanza de los demandados.

80. De conformidad a la enmienda solicitada y firmada, el último pago ahora sería de dieciséis millones de dólares ($16,000,000.00) (esto incluye el balance del PPOA de Guayanilla y el balance del Master de Tropical) y sería depositado el 15 de marzo del 2012 en la cuenta escrow.

81. Es menester mencionar que en varias ocasiones el Sr. Roberto Torres le solicitó al Sr. Rubén Pérez y al Sr. Mario Tomasini la evidencia de la radicación del "federal grant" ante el Departamento de Energía Federal. Ellos se comprometieron a entregar la misma, pero nunca lo hicieron.

82. Luego de la enmienda firmada (el 27 de diciembre del 2011), y de conformidad al

contrato suscrito entre las partes, se recibió la suma de tres millones de dólares ($3,000,000.00) en la cuenta escrow.[15] Sin embargo, al recibir el estado de cuenta, por parte de UBS, el Sr. Roberto Torres se percata que las dos (2) transferencia electrónicas realizadas (por la suma total de tres millones de dólares) no fueron realizadas por CIRO Energy, sino por una entidad de nombre Rosendin Electric, Inc., una compañía que no era parte de las negociaciones y hasta ese momento desconocida por el Sr. Roberto Torres.

83. Ante ello, el Sr. Roberto Torres se comunica con el Sr. Mario Tomasini para cuestionarle sobre esas transferencias, pues desconocía totalmente la procedencia de dichos fondos y temía que los mismos fueran productos de un lavado de dinero, pues no conocía nada sobre esa compañía Rosendin. De la misma forma, le indicó que consideraba altamente inapropiado que se hayan recibido estos fondos, de un tercero, en la cuenta escrow sin la notificación ni autorización de su parte.

84. Ante ello, el Sr. Mario Tomasini le indicó, al Sr. Roberto Torres, que esa compañía (Rosendin) le prestó el dinero a CIRO Energy y, como parte del requisito del préstamo, ellos mismos tenían que depositar el dinero directamente en el cliente de CIRO Energy, es decir, directamente en la cuenta escrow. De la misma forma, el Sr. Mario Tomasini le indicó al Sr. Roberto Torres, en ese momento, que Rosendin[16] no tenía nada que ver con la negociación entre CIRO Energy y él; que simplemente era un tercero que le había prestado el dinero a CIRO Energy.

85. Al ver este patrón de reiterado incumplimiento, el 17 de enero del 2012, el Sr. Roberto Torres le solicitó al "Escrow Agent" que cumpliera con su obligación y le desembolsará la suma de cuatro millones y medio ($4,500,000.00) que estaban en la cuenta escrow, a su nombre. El "Escrow Agent" cumplió con su obligación, de acuerdo a los "Escrow Agreement" y le desembolsó ese dinero al Sr. Roberto Torres. Sin embargo, el Sr. Roberto Torres, de buena fe, continuó negociando con CIRO con el propósito de culminar la transacción.

86. Como parte del TAC del 11 de noviembre las partes tenían que formalizar un contrato con los detalles de las transacciones. Esta redacción fue trabajada, durante el mes de enero del 2012, por los abogados de CIRO Energy (Nixon Peabody, LLP), una de las firmas legales más

---

[15] Sin embargo, debemos recordar, que CIRO Energy no cumplió con el primer depósito de quinientos mil dólares ($500,000.00) (del Master de Tropical), pues nunca cambió los bonos de inversiones por dinero en efectivo como lo requería el contrato.
[16] Eventualmente, se le informó al Sr. Roberto Torres que tanto Rosendin como Enovate son compañías relacionadas a CIRO y son las que se encargan de construir los proyectos de energía renovable de CIRO.

Case 3:12-cv-02010-GAG   Document 1-3   Filed 12/12/12   Page 19 of 33
*Tropical Solar Farm, LLC, et als. v. CIRO Group, Corp., et als.*
Demanda
~ 17 ~

grandes de los Estados Unidoss y quienes fungen como abogados de PREPA. Durante este proceso, CIRO Energy decidió, unilateralmente[17], que ya no quería comprar las acciones de Tropical Holding (y, por ende, adquirir ambos contratos), sino que querían comprar directamente los contratos (el PPOA de Guayanilla y el Master de Tropical).

87. De la misma forma, durante este proceso y de forma unilateral[18] por parte de CIRO Energy, éstos deciden que el contrato será suscrito a nombre de CIRO Two y CIRO Three y de CIRO Energy (entidad que había suscrito el TAC del 11 de noviembre) ni de CIRO Group (entidad que había suscrito el LOU del 10 de noviembre)

88. El Sr. Roberto Torres tuvo objeciones a estos cambios y el Lic. Jay Margulies, socio de Nixon Peabody, le indicó, personalmente, que de no consentir a estos cambios haría todo lo posible para lograr que estos contratos (el PPOA de Guayanilla y el Master de Tropical) en PREPA no tuvieran ningún valor, pues lograría que no consiguiera ningún inversionista al radicarle una "mega demanda".



89. Ante esta situación de extorsión, el Sr. Roberto Torres se vio en la obligación de acceder a estas enmiendas. Sin embargo, el Sr. Roberto Torres le indicó que no renunciaba a sus derechos contra las compañías que firmaron los TAC (CIRO Energy y sus accionistas), pues así estaba establecido en los TAC (sección de "miscellaneous" del TAC del 11 de noviembre y del 25 de noviembre).

90. De esa forma Nixon Peabody redacta un contrato titulado "Asset Purchase Agremeent" (en adelante APA) entre CIRO Two, CIRO Three y Tropical Holding, constituyendo esto lo que se denomina en los TAC como "definitive agreement".

91. Es menester mencionar que durante el mismo mes de enero del 2012 se recibió una Demanda, que incluía como demandado a Tropical Solar Farm, con unas alegaciones falsas, con el único propósito de interferir torticeramente con estas negociaciones. Como parte de las negociaciones, y de forma inmediata, el Sr. Roberto Torres le divulgó esta información a CIRO, sus subsidiarias y sus accionistas, los cuales, al reconocer la falsedad de las alegaciones, continuaron negociando con el Sr. Roberto Torres.[19] Esta Demanda fue incluida, en el Schedule 7(b) del APA como litigaciones en proceso. De la misma forma, la parte demandada le solicitó

---

[17] El Sr. Roberto Torres advino en conocimiento de este hecho al recibir el borrador del "Asset Purchase Agreement".
[18] El Sr. Roberto Torres advino en conocimiento de este hecho al recibir el borrador del "Asset Purchase Agreement".
[19] Es menester mencionar que el 24 de enero del 2012, el Sr. Rubén Pérez suscribió una Declaración Jurada reconociendo este hecho.

un relevo de responsabilidad a favor de las compañías CIRO Two y CIRO Three, así como de sus accionistas, con respecto a esta demanda. El Sr. Roberto Torres concedió dicho relevo.

92. El APA se firmó el 11 de febrero del 2012, entre CIRO Two, CIRO Three y Tropical Holding, finalizando, de esa forma, los acuerdos incluidos en los TAC del 11 y 25 de noviembre.

93. El APA incluía todas las cláusulas relacionadas a la compra de ambos contratos propiedad de Tropical Holding (el PPOA de Guayanilla y el Master de Tropical). Entre las provisiones más importantes, de este APA, se encuentran las siguientes:

    a. Previo de venta de ambos contratos (el PPOA de Guayanilla y el Master de Tropical) - veinte millones y medio ($20,500,000.00).

    b. Provisión de que se iba a otorgar un "Amended Final Escrow Agreement".

    c. CIRO le condonaba el préstamo que le realizará a Tropical Solar y al Sr. Roberto Torres, de doscientos mil dólares ($200,000.00), según establecido en el LOU del 2 de noviembre del 2011.

    d. Las partes se sometieron a la jurisdicción y competencia del Tribunal de Primera Instancia, Sala de Ponce.

    e. Se establece que los pagos se realizaran de acuerdo al "Amended Final Scrow Agreement" que se firmó el 11 de febrero del 2012.

94. Ese mismo día, 11 de febrero del 2012, se firmó un "Escrow Agreement" (una enmienda a los contratos previos) entre CIRO Two, CIRO Three, Tropical Holding, y UBS el cual enmendó los contratos previos. La cuenta escrow fue enmendada mediante este contrato, pero no se abrió una nueva. La cuenta escrow se mantuvo bajo el control de UBS ("escrow agent").

95. El "Escrow Agreement", firmado el 11 de febrero del 2012, mantenía inalterada las obligaciones de las partes. Sin embargo, nuevamente se modificó la estructura de pago, a saber:

    a. La estructura de pago de los veinte y medio millones de dólares ($20,500,000.00) era la siguiente:

        i. El 14 de noviembre del 2011 - CIRO Energy tenía que depositar en el "escrow account" la suma de un millón y medio de dólares ($1,500,000.00). CIRO Energy, como hemos visto, depositó el millón de dólares ($1,000,000.00) e incumplió, según establecido, con el pago de medio millón de dólares ($500,000.00), pues sus accionistas, en lugar de



Case 3:12-cv-02010-GAG   Document 1-3   Filed 12/12/12   Page 21 of 33
*Tropical Solar Farm, LLC, et als. v. CIRO Group, Corp., et als.*
Demanda
~ 19 ~

dinero en efectivo, depositaron unos bonos del gobierno.

ii. El 29 de diciembre del 2011 - CIRO Energy tenía que depositar en el "escrow account" la suma de tres millones de dólares ($3,000,000.00). Como hemos podido observar, CIRO Energy cumplió con este pago, pero no fue realizado por ellos sino por Rosendin, una tercera entidad.

iii. El 17 de febrero del 2012 - CIRO Energy tenía que depositar en el "escrow account" la suma de ocho y medio millón de dólares ($8,500,000.00). CIRO no cumplió con este deposito.

iv. El 15 de marzo del 2012 - CIRO Energy tenía que depositar en el "escrow account" la suma de siete y medio millón de dólares ($7,500,000.00). CIRO no cumplió con este deposito.

96. Este contrato de escrow le establecía unas obligaciones adicionales para que el "Escrow Agent" le desembolsara el dinero al Sr. Roberto Torres. Sin embargo, estas obligaciones adicionales no estaban relacionadas al desembolso por parte de CIRO a la cuenta escrow, sino estaban relacionadas al desembolso de la cuenta escrow a la cuenta del Sr. Roberto Torres. Por ende, CIRO tenía que cumplir con el deposito del dinero en la cuenta escrow independientemente de que el Sr. Roberto Torres cumpliera o no con estas obligaciones adicionales.

97. Entre las condiciones adicionales que el Sr. Roberto Torres tenía que cumplir, para que el "Escrow Agent" le desembolsará la suma de ocho millones y medio dólares ($8,500,000.00) que CIRO tenía que depositar el 17 de febrero del 2012, se encuentran las siguientes:

a. Tropical Solar Farm tenía que solicitar y obtener la asignación oficial, por parte de PREPA, del Master de Tropical a nombre de CIRO Three.

b. Tropical Solar debía solicitar y obtener unos cambios al Master de Tropical, según discutidos en una reunión que tuvieron (CIRO y el Sr. Roberto Torres) con PREPA el 31 de enero del 2012.

98. Sin embargo, CIRO no depositó la suma de ocho millones y medio de dólares ($8,500,000.00) que tenía que depositar el 17 de febrero del 2012 en la cuenta escrow. Esto claramente representa otro incumplimiento de contrato, demostrando así el patrón reiterado de su incumplimiento con los pagos a realizar.

99. No obstante ello, tanto el Sr. Rubén Pérez como el Sr. Mario Tomasini, pretendían que Tropical Solar obtuvieran la asignación oficial de PREPA del Master de Tropical a favor de CIRO y los cambios solicitados, los cuales únicamente le beneficiaban a CIRO y no a Tropical Solar.

100. El Sr. Roberto Torres, como representante de Tropical Solar, le había solicitado a PREPA, con anterioridad a esta fecha, la asignación del Master de Tropical y del PPOA de Guayanilla a favor de CIRO. Sin embargo, al percatarse que después de esta asignación ya los contratos le pertenecerían legalmente a CIRO (independientemente de que estos cumplieran sus obligaciones, es decir, cumplieran con el pago), detuvo el proceso hasta que ellos demostraran su capacidad e intención de pago.

101. De forma paralela, y ante el incumplimiento con el pago del 17 de febrero del 2012, el Sr. Roberto Torres le solicita al Sr. Rubén Pérez y al Sr. Mario Tomasini que cumplieran con su obligación de realizar el deposito de ocho millones y medio de dólares ($8,500,000.00). Sin embargo, el Sr. Rubén Pérez y el Sr. Mario Tomasini le indicaron, al Sr. Roberto Torres, que ellos no contaban con el capital en el momento y le pidieron que continuará con la asignación de los contratos (de parte de PREPA a favor de CIRO) y la obtención de las enmiendas por ellos solicitadas, que ellos, eventualmente, conseguirían el dinero. Sin embargo, ni el Sr. Rubén Pérez ni el Sr. Mario Tomasini pudieron identificarle, al Sr. Roberto Torres, una fecha específica de la entrega del dinero, pues aducían no tener el mismo.

102. El Sr. Roberto Torres, al darse cuenta de la falta de intención y capacidad de CIRO de cumplir con sus obligaciones contractuales (en especifico, el pago), no tuvo otro remedio que paralizar las gestiones en PREPA a favor de CIRO.

103. Por su parte, CIRO, ante su inhabilidad económica de cumplir con su obligación del 17 de febrero del 2012 (de depositar los ocho millones y medio de dólares en la cuenta escrow) le solicitó al Sr. Roberto Torres una extensión para dicho deposito para el 24 de febrero del 2012. El Sr. Roberto Torres aceptó la enmienda en ánimo de que CIRO pudiera cumplir con sus obligaciones contractuales para con él. Dicha enmienda se firmó el 17 de febrero del 2012.

104. El 24 de febrero 2012, CIRO no deposito el dinero en la cuenta escrow, según acordado en la enmienda del 17 de febrero del 2012. De esa forma, CIRO incumplía, nuevamente, con su obligación de pago.

105. En esos momentos, el Sr. Roberto Torres le indica a CIRO que no pueden

Case 3:12-cv-02010-GAG   Document 1-3   Filed 12/12/12   Page 23 of 33
*Tropical Solar Farm, LLC, et als. v. CIRO Group, Corp., et als.*
Demanda
~ 21 ~

continuar concediendo extensiones porque los proyectos tienen una fecha límite para comenzar la construcción y las operaciones (las cuales surgen del propio PPOA de Guayanilla y del Master de Tropical) y estas extensiones ponían en grave peligro que Tropical Solar pudiera cumplir con los contratos otorgados con PREPA (PPOA de Guayanilla y el Master de Tropical) y, por ende, Tropical Solar caer en un incumplimiento para con PREPA.

106.    Ante esto, el Sr. Rubén Pérez y el Sr. Mario Tomasini, le indicaron que no tenían dinero para completar el contrato y aceptaron que tampoco habían cumplido con su obligación de solicitar ante el Departamento de Energía Federal y adquirir el equipo para el "federal grant". Hasta ese momento, tanto el Sr. Rubén Pérez como el Sr. Mario Tomasini, le habían asegurado al Sr. Roberto Torres que esto se había llevado a cabo. Inclusive, invitaron al Sr. Roberto Torres a un almacén que había en la zona portuaria donde supuestamente estaba el equipo adquirido, lo que resultó ser falso, pues era equipo para su proyecto de Salinas no para los proyectos de Tropical Solar.

107.    En ese momento, y con esa información (de que CIRO no tenía la capacidad económica para cumplir con sus obligaciones contractuales y más aún de que no había solicitado el "federal grant"), Tropical Solar se enfrentó a tener unos contratos que no tendrían el "federal grant" necesario para lograr la viabilidad económica de los proyectos y ante las amenazas constantes de CIRO de demandarlos y paralizar sus proyectos, Tropical Solar no tuvo otro remedio que desistir de los contratos en PREPA durante el mes de febrero del 2012. Esto fue así porque la falta del "federal grant" afectó, significativamente, la viabilidad económica del proyecto. En adición a ello, el Sr. Rubén Pérez y el Sr. Mario Tomasini se encargaron de difundir, en toda la industria, de que cualquier entidad o persona que adquiriese los proyectos de Tropical Solar se enfrentaría a una demanda con ellos, lo cual, obviamente, evitaba que Tropical Solar consiguiese un comprador para sus proyectos o un inversionista para los mismos.

108.    El Sr. Roberto Torres continuó las negociaciones con PREPA, ahora a través de una nueva entidad, Jonas Solar Energy, LLC, compañía distinta y no relacionada con Tropical Solar Farm y con Tropical Holding.

109.    Jonas Solar logró obtener su propio Master Agreement (en adelante Master de Jonas) con PREPA el 13 de marzo del 2012.

110.    Al enterarse el Sr. Rubén Pérez y el Sr. Mario Tomasini de que Jonas Solar había obtenido un Master con PREPA, se comunicaron con el Sr. Roberto Torres para insistirle en que

se le diera la oportunidad de comprar el Master de Jonas exigiendo que se le concediera como crédito los cuatro millones y medio de dólares ($4,500,000.00) perdidos (como penalidad) en el contrato con Tropical.

111.   El 7 de marzo del 2012 se firmó un nuevo "Asset Purchase Agreement" (APA con Jonas) entre CIRO Two, CIRO Three y Jonas para la compra exclusivamente del Master de Jonas por la suma de veinte millones y medio de dólares ($20,500,000.00). En este momento Jonas no tenía más contratos con la PREPA.

112.   Como parte de este contrato, el Sr. Roberto Torres aceptó concederle un crédito a CIRO por la suma de cuatro millones y medio de dólares ($4,500,000.00), pero requirió un deposito adicional de doscientos cincuenta mil dólares ($250,000.00), los cuales fueron depositados en la cuenta escrow por CIRO.

113.   De esa forma, después de aplicarle el crédito que el Sr. Roberto Torres estuvo dispuesto a concederle a CIRO, y el pago de doscientos cincuenta mil dólares ($250,000.00), CIRO debía depositar la suma de quince millones setecientos mil dólares ($15,750,000.00) el 22 de marzo del 2012.

114.   Nuevamente, en este contrato, las partes se sometieron a la jurisdicción y competencia del Tribunal de Primera Instancia, Sala de Ponce.

115.   Ese mismo día, 7 de marzo del 2012, se firmó un "Escrow Agreement" (una enmienda a los contratos previos) entre CIRO Two, CIRO Three, Jonas y UBS, el cual enmendó los contratos previos. La cuenta escrow fue enmendada mediante este contrato, pero no se abrió una nueva. La cuenta escrow se mantuvo bajo el control de UBS ("escrow agent").

116.   Mediante dicho contrato del 7 de marzo del 2012, la estructura de pago de los veinte millones y medio de dólares ($20,500,000.00) era la siguiente:

a.   En o antes del 25 de febrero del 2012 - CIRO Energy tenía que depositar en el "escrow account" la suma de cuatro millones setecientos cincuenta mil de dólares ($4,750,000.00). Ya hemos visto, en el presente documento como CIRO cumplió, de forma distinta, con este pago.

b.   El 22 de marzo del 2012 - CIRO Energy tenía que depositar en el "escrow account" la suma de quince millones setecientos cincuenta mil de dólares ($15,750,000.00).

117.   CIRO volvió a incumplir con sus obligaciones contractuales, pues no depositó, el

Case 3:12-cv-02010-GAG   Document 1-3   Filed 12/12/12   Page 25 of 33
*Tropical Solar Farm, LLC, et als. v. CIRO Group, Corp., et als.*
Demanda
~ 23 ~

22 de marzo del 2012, los quince millones setecientos cincuenta mil de dólares ($15,750,000.00), que tenía que depositar en la cuenta escrow.

118. Definitivamente el patrón reiterado de incumplimiento, por parte de los demandados para con el demandante, demuestra, claramente y sin lugar a dudas, que nunca tuvieron la intención real de cumplir con sus obligaciones contractuales y que estaban negociando de mala fe.

119. Estas actuaciones, por parte de los demandados, le ha causado graves y serios daños a la parte demandante.

120. A pesar de este incumplimiento, y todos los incumplimientos previos, CIRO intentó, en varias ocasiones, que la parte demandante le vendiera sus proyectos. Sin embargo, para ello no negoció de buena fe y prefirió utilizar métodos no permitidos por nuestras leyes.

121. CIRO continuó con su patrón de extorsión, para lograr que la parte demandante le vendiera sus proyectos bajo los términos y condiciones establecidos por ellos.

122. CIRO continuó amenazando a la parte demandante, ahora en particular a Jonas y al Sr. Roberto Torres, de demandarlos y lograr que sus proyectos no se pudieran culminar. Las amenazas de CIRO, en torno a la demanda, aunque fuera infundada e inmeritoria, eran porque conoce que los inversionistas no invierten en proyectos que puedan estar en peligro por reclamaciones judiciales. Es por ello, que CIRO continúa con sus amenazas de lograr que la parte demandante no pudiera conseguir ningún inversionista para sus proyectos.

123. CIRO siempre le indicó a la parte demandante que esto no sería necesario de ellos acceder a sus solicitudes (es decir, venderle los proyectos bajo sus términos y condiciones). Esto claramente, representa un patrón de extorsión de los demandados para con los demandantes.

124. El 9 de mayo del 2012 Jonas suscribió un PPOA para un proyecto de 40MW ubicado en Peñuelas, Puerto Rico (en adelante PPOA de Peñuelas).

125. Cuando CIRO adviene en conocimiento de que Jonas obtuvo el PPOA de Peñuelas vuelve a intentar comprar el PPOA de Peñuelas y el Master de Jonas. Sin embargo, estas gestiones fueron parte del patrón de extorsión que mantuvieron y han mantenido los demandados en contra de la parte demandante.

126. Es por ello, que tanto Jonas como el Sr. Roberto Torres, se negaron a las intenciones de los demandados. Por lo mismo, los demandados continuaron con su patrón de extorsión y sus continuas amenazas de demandas.

127.    Durante el mes de junio del 2012, el Sr. Mario Tomasini se comunicó con el Sr. Roberto Torres y le expresa que están dispuestos a comprar los contratos, pero al precio depositado, esto a raíz del escandalo noticioso surgido en ese momento.

128.    Como el Sr. Roberto Torres rechazó esta oferta, CIRO, a través de sus oficiales y accionistas, comienza una campaña difamatoria en contra de los demandantes. Ante ello, el Sr. Roberto Torres le remite copia de unos "good standings" que PREPA emitió indicando que los contrados estaban vigentes y que no había ninguna actuación ilegal en su otorgamiento.

129.    Al recibir estos documentos, tanto el Sr. Rubén Pérez como el Sr. Mario Tomasini, comienzan a difundir que esos documentos son fraudulentos en ánimo de asegurarse que ningún inversionista comprará los proyectos de Jonas.

130.    En noviembre del 2012, el Sr. Mario Tomasini se comunicó con el Sr. Roberto Torres y le expresó que tenía conocimiento de que éste y Jonas estaban negociando con Panasonic el desarrollo y venta de los proyectos. El Sr. Mario Tomasini le indica, al Sr. Roberto Torres, que necesitaba reunirse con él de forma urgente y lo cita a una reunión, para el 7 de noviembre del 2012, en las oficinas de CIRO y Rosendin en Guaynabo, Puerto Rico.

131.    En dicha reunión, el Sr. Mario Tomasini le muestra una Demanda al Sr. Roberto Torres (solamente se la mostró, pero no se la dejó leer) donde CIRO Energy Partners, LLC demandaba al Sr. Roberto Torres, su esposa y sus compañías. El Sr. Mario Tomasini le indica al Sr. Roberto Torres que sino accedía a los términos y condiciones de ellos, radicarían esa demanda y, por ende, podrían en peligro sus proyectos. El Sr. Mario Tomasini le expresó, en dicha reunión, que ellos sabían que esa Demanda no tenía fundamento alguno, pero que sí le causarían un grave daño económico al Sr. Roberto Torres, sus corporaciones y a sus proyectos. Que esto tendría el efecto de que Panasonic se reiterara de cualquier negociación con Jonas y, por ende, ellos tendrían que venderle a CIRO bajo sus términos. El Sr. Roberto Torres le indica que él no aceptará ese patrón de extorsión y le recomendó que revaluara su postura porque lo que estaban haciendo era un acto criminal y no de negocios. Le expresa además que las puertas estaban abiertas para llegar a cualquier acuerdo de negocios, pero no criminal. El Sr. Roberto Torres le indica, también, que esta dispuesto a honrarle el acuerdo de veinte millones y medio de dólares ($20,500,000.00), y por ende, el crédito contenido en el APA de Jonas para la adquisición del Master de Agreement, porque el PPOA de Peñuelas nunca fue parte de la negociación.

Case 3:12-cv-02010-GAG   Document 1-3   Filed 12/12/12   Page 27 of 33
Tropical Solar Farm, LLC., et als. v. CIRO Group, Corp., et als.
Demanda
~ 25 ~

132.   El Sr. Mario Tomasini le indica, al Sr. Roberto Torres, que quiere ambos contratos, aunque el PPOA de Peñuelas no había sido parte del APA.

133.   Después de esa comunicación, el Sr. Mario Tomasini le indicó al Sr. Roberto Torres que le daría su respuesta el 8 de noviembre del 2012.

134.   El 9 de noviembre del 2012, el Sr. Mario Tomasini llamó al Sr. Roberto Torres y le dijo que no aceptaba esa oferta (la de honrar el APA de Jonas), pero que quería completar el negocio (del Master de Jonas, pero que ahora quería incluir el PPOA de Peñuelas, a pesar de saber que nunca formó parte de las negociaciones) por el precio de venta de dieciséis millones de dólares ($16,000,000.00) y que tenía que concederle un crédito por los cuatro millones y medio de dólares ($4,500,000.00) que CIRO ya le había pagado y le pertenecían al Sr. Roberto Torres en virtud de la cláusula penal contenida en los contratos. Es decir, de aceptarse esta oferta, CIRO debería once millones y medio de dólares ($11,500,000.00).

135.   Ante esta comunicación, por parte de CIRO, el Sr. Roberto Torres le indica que estaba dispuesto a finalizar el contrato (la compra del Master de Jonas), pero por el precio de veinte millones de dólares ($20,000,000.00), reduciendo, de esa forma, el precio previamente acordado de veinte millones y medio de dólares ($20,500,000.00).



136.   Esta comunicación de oferta fue confirmada por el Sr. Roberto Torres, vía correo electrónico dirigido al Sr. Mario Tomasini, el 9 de noviembre del 2012. Este correo electrónico fue contestado por el Sr. Mario Tomasini haciéndole acusaciones difamatorias, al Sr. Roberto Torres, y le expresa que si quiere alguna negociación con ellos (la parte demandada) están disponibles, pero a la misma vez le "recuerda" que sino accede a sus términos y condiciones, radicarían la demanda en su contra con el único propósito de obligarlos a aceptar sus términos. Menciona, además, que su nuevo y poderoso aliado, Rosendin, formaría parte de la demanda.

137.   Finalmente el 21 de noviembre del 2012, CIRO Energy Partners, LLC demandó a la parte demandante. La Demanda realmente fue presentada el 7 de noviembre del 2012, pero la parte demandante fue emplazada el 21 de noviembre del 2012.

138.   Esta actuación, por parte de los demandados, le ha causado graves y serios daños a la parte demandante, incluyendo la paralización de las negociaciones con Panasonic.

139.   Al examinar la demanda, el Sr. Roberto Torres se percata de que violaron los acuerdos contractuales, pues, por ejemplo, recurrieron al foro federal cuando en los contratos se sometieron a la jurisdicción del Tribunal de Primera Instancia, Sala de Ponce. De la misma

forma, y con el único propósito de no afectar sus activos del grupo controlado de corporaciones de CIRO y de sus accionistas, el Sr. Rubén Pérez y el Sr. Mario Tomasini utilizaron, como parte demandante, a una entidad nueva (CIRO Energy Partners[20]), entidad que no había hecho negocios con la parte demandante.

140.    La parte demandante, en esa demanda, utiliza unas expresiones difamatorias, que salieron en la prensa de Puerto Rico, para esbozar una teoría de fraude y corrupción, uniéndolas a acontecimientos que no sucedieron, para crear temor en la parte demandada y más aún en los posibles inversionistas de sus proyectos, y de esa forma ejercer presión para que el Sr. Roberto Torres y Jonas aceptaran sus términos y condiciones. Todo esto es parte del patrón de extorsión de la parte demandada.

141.    A pesar de las alegaciones contenidas en la Demanda, el Sr. Mario Tomasini y el Sr. Duncan Frederick, representante de Rosendin y de su subsidiaria, Enovate, se reunieron con el Sr. Roberto Torres en el Restaurante Pito's de Ponce, bajo falsas premisas de que se discutiría una cantidad de dinero (para que el Sr. Roberto Torres le pagara a ellos) para retirar la demanda incoada en el foro federal. Sin embargo, en  dicha reunión, tanto el Sr. Mario Tomasini como el Sr. Duncan Frederick, le indicaron al Sr. Roberto Torres que a ellos no le interesaba ningún tipo de negociación monetaria; que ellos lo que quieren es los dos (2) contratos de Jonas (PPOA de Peñuelas y el Master de Jonas) y que se les brinde hasta el 30 de noviembre del 2012 para redactar una oferta al respecto.

142.    El 30 de noviembre del 2012, aproximadamente a las dos de la tarde (2:00pm), el Sr. Duncan Frederick se reunió con el Sr. Roberto Torres en el Restaurante Pito's de Ponce con la intención de presentarle su propuesta de negocios. La "propuesta de negocios" presentada, en ese momento, a nombre de CIRO, incluye la compra de ambos contratos por la suma de dieciocho millones de dólares ($18,000,00.00) y la concesión de un crédito por seis millones de dólares ($6,000,000.00) en lugar de los cuatro millones setecientos mil dólares ($4,750,000.00) que CIRO realmente había pagado.

143.    El Sr. Duncan Frederick, en ese momento, le indica al Sr. Roberto Torres, que de no aceptar esa oferta, su compañía (Rosendin Electric) y CIRO se encargarían de postergar la acción civil en su contra hasta que sus contratos no sean viables (por las fechas de "deadline").

---

[20] Según se indica en la Demanda, esta entidad se compone de una sociedad de CIRO Group y Enovate Advisors, LLC, aparente subsidiaria de Rosendin Electric (compañía que alegadamente le prestó a CIRO los tres millones de dólares del depósito del 29 de diciembre del 2011).

Case 3:12-cv-02010-GAG   Document 1-3   Filed 12/12/12   Page 29 of 33
*Tropical Solar Farm, LLC, et als. v. CIRO Group, Corp., et als.*
Demanda
~ 27 ~

El Sr. Roberto Torres rechazó la oferta y se fue del lugar, no sin antes decirle al Sr. Duncan Frederick, que sus actuaciones, y de todos los aquí demandados, son actos criminales penalizados por las leyes locales y federales.

144.   La parte demandada ha incumplido, en varias ocasiones e instancias, los contratos suscritos entre las partes.

145.   La parte demandada, en reiteradas ocasiones, incumplió con sus obligaciones contractuales al no depositar los pagos en las fechas acordadas.

146.   De la misma forma, la parte demandada incumplió con sus obligaciones contractuales al depositar unas inversiones personales del Sr. Mario Tomasini y del Sr. Rubén Pérez en lugar del medio millón de dólares ($500,000.00) que debía depositar en la cuenta escrow.

147.   Por lo mismo, y de conformidad a las cláusulas penales incluidas en los contratos, el Sr. Roberto Torres puede retener la suma de cuarto millones setecientos mil dólares ($4,750,000.00).

148.   La parte demandada, tanto las entidades corporativas como los accionistas en su carácter personal, incumplieron la garantía de obtener el "federal grant", por lo mismo, vienen obligados a pagarle al Sr. Roberto Torres, por concepto de daños y como cláusula penal, la suma de veinte millones y medio dólares ($20,500,000.00).

149.   De la misma forma, la parte demandada recurrió al Tribunal Federal a radicar una Demanda a sabiendas de que se sometió a la jurisdicción del Tribunal de Primera Instancia, Sala de Ponce, e incluyó, como demandante una tercera entidad que no había suscrito los contratos con la parte demandante.

150.   La parte demandada, con sus actuaciones, ha demostrado que nunca tuvo la intención real de cumplir con sus obligaciones contractuales y, por ende, comprar los proyectos de Tropical Solar, Tropical Holding y Jonas, pues no tenía la capacidad económica para ello.

151.   La parte demandada entró en unas negociaciones con la parte demandante a sabiendas, y actuando de mala fe, sin la intención de cumplir con sus obligaciones contractuales y con el único propósito de hacer que la parte demandante perdiera sus contratos con PREPA, pues estos tienen unas fechas límites para comenzar a construirse y desarrollarse los proyectos de energía renovable.

152.   Ello ha sido demostrado porque, mientras CIRO negociaba y suscribía contratos

Tropical Solar Farms LLC, et als. v. CIRO Group, Corp. et als.
Demanda
~ 28 ~

Case 3:12-cv-02016-GAG   Document 1-3   Filed 12/12/12   Page 30 of 33

con la parte demandante, a la misma vez, le solicitaba a PREPA que le autorizará un punto de interconexión en el área de Guayanilla. Ello constituye una actuación vedada por nuestro sistema jurídico y la forma de negociar en Puerto Rico. De la misma forma, constituye una violación al contrato, pues CIRO estaba compitiendo con el proyecto de Tropical cuando eso estaba prohibido en los contratos suscritos entre las partes.

153.    La parte demandada obtuvo información de negocios de Tropical Solar, Tropical Holding y Jonas que de otra forma no hubiese obtenido, a sabiendas de que no tenía la intención real de cumplir con sus obligaciones contractuales, pues no tenía la capacidad económica para ello.

154.    Estas actuaciones, por parte de los demandados, le causaron graves daños a la parte demandada.

155.    La falta de cumplimiento de los contratos y las actuaciones dolosas e intencionales, por parte de los demandados, provocó que Tropical Solar tuviera que renunciar a sus contratos con PREPA.

156.    La falta de cumplimiento de los contratos y las actuaciones dolosas e intencionales, por parte de los demandados, le causó daños a Tropical Solar y a Tropical Holding los cuales se estiman en una suma no menor de doce millones y medio de dólares ($12,500,000.00) por el PPOA de Guayanilla y una suma adicional de ocho millones de dólares ($8,000,000.00) por el Master.

157.    La falta de cumplimiento de los contratos y las actuaciones dolosas e intencionales, por parte de los demandados, le causó daños a Tropical Solar y a Tropical Holding los cuales se estiman en una suma no menor de quinientos treinta millones de dólares ($530,000,000.00) por concepto de las ganancias dejadas de percibir durante la vigencia del contrato con PREPA.

158.    La falta de cumplimiento de los contratos, las actuaciones dolosas e intencionales, y el patrón de extorsión, por parte de los demandados, le esta causando daños a Jonas Solar los cuales se estiman en una suma no menor de treinta y cinco millones de dólares ($35,000,000.00).

159.    De la misma forma, las actuaciones dolosas e intencionales de los demandados, al lograr que Jonas incluyera en su Master terrenos que únicamente benefician a CIRO y que no han querido ser "liberados", le han causado daños a Jonas, pues impiden que Jonas tenga el terreno disponible para desarrollar sus proyectos. Estos daños se estiman en una suma no menor

Case 3:12-cv-02010-GAG   Document 1-3   Filed 12/12/12   Page 31 of 33
*Tropical Solar Farm, LLC, et als. v. CIRO Group, Corp., et als.*
Demanda
~ 29 ~

de ciento cincuenta millones de dólares ($150,000,000.00)

160.    Las actuaciones dolosas e intencionales de los demandados han puesto en grave peligro de que Jonas pierda la compra de sus proyectos (PPOA de Peñuelas y Master de Tropical).

161.    De la misma forma, las actuaciones dolosas e intencionales de los demandados ponen en peligro los contratos de Jonas, pues le afecta su capacidad para cumplir con los contratos con PREPA (por las fechas límites que los mismos contienen).

162.    De las actuaciones de los demandados afectar el cumplimiento de los contratos con PREPA le causarían daños a Jonas, Sr. Roberto Torres y a un tercero, en una suma no menor de seiscientos cincuenta millones de dólares ($650,000,000.00), por concepto de las ganancias que podrían dejar de percibir durante la vigencia del contrato con PREPA.

163.    Las actuaciones dolosas e intencionales de los demandados y el patrón de extorsión que ellos han tenido para con los demandantes ha repercutido en una interferencia torticera con las obligaciones contractuales.

164.    El patrón de extorsión que ha llevado la parte demandada ha repercutido en las negociaciones que Jonas tiene con un tercero que le comprará su proyecto.

165.    La parte demandada ha actuado de esta forma con el único propósito de afectar las negociaciones de Jonas con este tercero y, por ende, obligar a Jonas, y al Sr. Roberto Torres, a venderle el PPOA de Peñuelas y el Master de Jonas al precio y bajo las condiciones que ellos establezcan.

166.    El Sr. Roberto Torres ha sufrido daños y angustias mentales al ser objeto de este patrón de extorsión, por parte de los demandados, cuantía que se estima en una suma no menor de un millón de dólares ($1,000,000.00).

167.    El Sr. Roberto Torres ha sufrido daños económicos, en su carácter personal, pues el incumplimiento de los demandados con sus obligaciones contractuales y su patrón de manipulación y extorsión han obligado al Sr. Roberto Torres ha incurrir en gastos, cuantía que se estima en una suma no menor cinco millones de dólares ($5,000,000.00).

168.    El 14 de noviembre del 2011 el Sr. Roberto Torres firmó con CIRO Energy un "Consulting Agreement", en el cual el Sr. Roberto Torres se comprometió con CIRO Energy a brindarle los servicios enumerados en el párrafo número dos (2) del contrato por un periodo de doce (12) meses. Dichos servicios, esencialmente, estaban relacionados a asistirlos y

representarlos en sus proyectos de energía renovable.

169.     Como contraprestación, CIRO Energy le pagaría la suma de un millón de dólares ($1,000,000.00) al Sr. Roberto Torres, divididos en cuatro (4) pagos de $250,000.00 cada uno, a saber: 14 y 21 de noviembre, 15 de diciembre del 2011 y 16 de enero del 2012.

170.     Dichas gestiones culminaron cuando el Sr. Roberto Torres obtuvo un Master Agreement de 100MW a favor de CIRO. Es por ello, que CIRO le pagó dicha suma de dinero.

171.     Sin embargo, y sabiendo que no es parte de los contratos de Tropical y Jonas, la parte demandada pretende incluir esta suma de dinero como parte del deposito de los contratos, a sabiendas de que no es parte del contrato y como parte del patrón de extorsión en contra de los demandantes.

172.     Los demandados han incurrido en actuaciones vedadas por la Ley contra el Crimen Organizado y Lavado de Dinero del Estado Libre Asociado de Puerto Rico, Ley número 33 del 13 de julio de 1978, según enmendada, 25 LPRA sec. 971, *et seq.*

173.     Los demandados, en común acuerdo, han violado la Ley contra el Crimen Organizado al utilizar distintas corporaciones para ocultar sus bienes y activos y para incurrir en un patrón de extorsión contra el Sr. Roberto Torres y sus corporaciones, aquí demandantes.

174.     Todas las corporaciones demandadas están relacionadas entre sí, y constituyen un grupo controlado por los aquí demandados en su carácter personal.

175.     Los aquí demandados, en carácter personal, utilizaron las empresas demandadas para ocultar sus bienes y para llevar a cabo un patrón de extorsión contra el Sr. Roberto Torres y sus corporaciones, aquí demandantes.

176.     Por lo mismo, los actos aquí mencionados constituyen una violación al Racketeer Influenced and Corrupt Organizations, 18 USC sec. 1961, *et seq.* (en adelante RICO Act).

177.     Las actuaciones de los demandados de extorsionar a los demandantes es un acto vedado por el RICO Act.

178.     Conforme al RICO Act se solicitan que todos los daños aquí enumerados sean triplicados y se concedan, además, las costas, los gastos y una suma razonable por concepto honorarios del proceso.

179.     Conforme al RICO Act y a la Ley de Lavado de Dinero se solicita que este Honorable Tribunal refiera este caso al Departamento de Justicia de Puerto Rico y al Federal Bureau of Investigation, para la investigación correspondiente de todas las cuentas bancarias,

*Tropical Solar Farm, LLC, et als. v. CIRO Group, Corp., et als.*
Demanda
~ 31 ~

personales y corporativas, de los aquí demandados, pues constituyen una violación a las leyes antes mencionadas tanto en términos federales como estatales.

180.   Se solicita, además, que se congelen todas las cuentas de los aquí demandados para evitar que el movimiento del dinero y activos entre otros ellos y/o otros entes corporativos dilapiden los fondos y/o los oculten.

EN MÉRITO DE LO ANTES EXPUESTO, respetuosamente se solicita de este Honorable Tribunal que declare HA LUGAR la presente Demanda, y, por ende, determine que la parte demandada ha incumplido sus contratos, ha incurrido en un patrón de extorsión, ha interferido con las obligaciones contractuales y ha actuado de forma negligente, dolosa e intencional en contra de la parte demandante y dichas actuaciones le han causado daños a dicha parte y, por consiguiente, ordene el pago de una suma no menor de cincuenta y dos y medio millones de dólares ($55,500,000.00), más una suma no menor de quinientos treinta millones de dólares ($530,000,000.00) por concepto de las ganancias dejadas de percibir durante la vigencia del contrato con PREPA, más una suma no menor de ciento cincuenta millones de dólares ($150,000,000.00) por concepto de la perdida de los terrenos incluidos en el Master de Jonas, más una suma no menor de seiscientos cincuenta millones de dólares ($650,000,000.00) (en caso de afectarse el contrato de Jonas), por concepto de las ganancias dejadas de percibir durante la vigencia del contrato con PREPA, en concepto de daños y perjuicios a favor de la parte demandante. Se solicita, además que, conforme al RICO Act le apliquen la triple penalidad, por ende, estos daños se triplicarían. También se solicitan, las costas, los gastos y una suma razonable por concepto honorarios del proceso.

En Ponce, Puerto Rico, a 3 de diciembre del 2012.

**Muñoz Nazario Law Offices, PSC**
PO Box 801480
Coto Laurel, Puerto Rico, 00780-1480
pilar@munoznazario.com
Tel: (787) 843-6060
Fax: (787) 843-6080


**Pilar Muñoz Nazario**
Colegiada núm. 16,362
Tribunal Supremo núm. 15,351